IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

WILLIAM F. OSBORNE,         )     CASE NO. 1:12-cv-01904
                   )
        Plaintiff,     )     MAGISTRATE JUDGE
                   )     KATHLEEN B. BURKE
     v.           )
                   )
COMMISSIONER OF SOCIAL    )
SECURITY ADMINISTRATION,[1]  )
                   )     **MEMORANDUM OPINION & ORDER**
        Defendant.   )

Plaintiff William F. Osborne ("Plaintiff" or "Osborne") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 15.  As set forth below, the Administrative Law Judge ("ALJ") included in his Residual Functional Capacity ("RFC") assessment of Osborne a limitation to "simple, routine, and repetitive" work but failed to include that limitation in his hypothetical question to the Vocational Expert, an error that means the Commissioner's decision is not supported by substantial evidence of record.  In addition, the ALJ erred by failing clearly to explain how he accounted in the RFC for his finding that Osborne was moderately limited in concentration, persistence and pace.  Accordingly, the Court **REVERSES** and **REMANDS** the Commissioner's decision for further proceedings consistent with this Memorandum Opinion and Order.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

## I.  Procedural History

Osborne filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on or about March 27, 2008.[2]  Tr. 66-69, 95-101, 102-04, 125.  Osborne alleged a disability onset date of April 30, 2003.  Tr. 95, 102, 130.   He alleged disability based on seizures, epilepsy, back pain, liver and pancreas damage, depression, anxiety, and short term memory loss.  Tr. 71, 74, 78, 81, 130.  After initial denial by the state agency on July 2, 2008 (Tr. 70-76), and denial upon reconsideration on December 29, 2008 (Tr. 78-83), Osborne requested a hearing (Tr. 87).  On September 28, 2010, ALJ Kurt G. Ehrman conducted an administrative hearing.  Tr. 30-65.

In his October 13, 2010, decision (Tr. 11-29), the ALJ determined that Osborne had not been under a disability from April 30, 2003, through the date of the decision.  Tr. 24.  Osborne requested review of the ALJ's decision by the Appeals Council.  Tr. 9-10.  On May 25, 2012, the Appeals Council denied Osborne's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal and Vocational Evidence

Osborne was born on April 24, 1969.  Tr. 95, 102.  Osborne's wife passed away in 2006.  Tr. 40.  He completed the 11th grade.  Tr. 136.  Osborne last worked in 2003 as a machinist.  Tr. 37-38, 131.  As part of his past employment, he supervised other individuals.  Tr. 131-32.  In 2003, the company that he was working for shut down.[3]  Tr. 38.  Osborne does not have a

---

[2] Osborne filed three prior applications, which were denied on July 23, 2003, September 1, 2004, and June 21, 2007.  Tr. 14, 126.  The ALJ indicated that those determinations were final and no new and material evidence had been received to reopen the prior applications.  Tr. 14.

[3] Osborne indicated that he started having seizures several months before the company shut down and he continued to have seizures after his work ended.  Tr. 38.

driver's license and cannot drive because of his seizures.  Tr. 50, 138.  In 2008, Osborne reported

that he was living with his mother and her husband.  Tr. 138.  He also reported that, when he was

having a good day and his medication was working, he was able to cook for himself. Tr. 138.  He

could wash some dishes and clean up after himself.  Tr. 138.  He visited with friends who lived

next door and visited with friends of the family when they came over.  Tr. 138.  At times, he

stayed with his girlfriend.  Tr. 138.

**B.     Medical Evidence**

**1.     Treating medical providers**

**<u>Nord Center Treatment</u>**

On August 25, 2009, upon referral by his neurologist, Osborne sought treatment at the

Nord Center for his anxiety and depression.  Tr. 430.  In the initial assessment, diagnoses

included posttraumatic stress disorder and depressive disorder, not otherwise specified, with a

GAF score of 60.[4]  Tr. 439.  No psychiatric evaluation was recommended.  Tr. 438, 448.  Follow

up sessions were scheduled (Tr. 448) but Osborne missed a number of those sessions.  Tr.  444-

47.

**<u>Thomas A. Williams, MA, LPCC</u>**

On March 15, 2010, Osborne met with Thomas A. Williams, a licensed professional

clinical counselor, who was associated with psychiatrist Byong J. Ahn's office, and Mr.

Williams completed a Clinician Interview/Treatment Plan.  Tr. 478-80.   Osborne's chief

complaint was that he had been dealing with a long history of anxiety problems.  Tr. 478.  He

was sad and tearful and was unable to focus.  Tr. 478.  He stated that he tended to isolate himself

---

[4] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

and lacked patience to deal with other people.  Tr. 478.  He also indicated that he struggled with focusing and paying attention and his memory was impaired.  Tr. 478.  In the mental status examination portion of Mr. William's evaluation, Mr. Williams indicated that Osborne's mood was depressed and Osborne was anxious.  Tr. 480.  Osborne's recent and remote memory was intact.  Tr. 480.  Mr. Williams noted that Osborne's thought process was logical but it was pressured.  Tr. 480.  Osborne's speech was also pressured.  Tr. 480.  Osborne's insight and judgment were fair.  Tr. 480.  Mr. Williams assessed Osborne as a low risk; Osborne did not report any plans to hurt himself.  Tr. 480.  Mr. Williams indicated that Osborne's strength was his willingness to get help for his problems whereas his weakness was his poor self-esteem and self-confidence.  Tr. 480.

Osborne continued to see Mr. Williams and, on April 12, 2010, Osborne indicated that things were "about status quo."  Tr. 477.  On May 24, 2010, Osborne indicated that he had taken Mr. Williams' advice and tried exercising as a way to alleviate some of his stress and anxiety. Tr. 476.  Although exercising had relieved some of his anxiety, Osborne reported that he was still dealing with some anxiety and was not sleeping well.  Tr. 476.  At the May 24, 2010, visit, Mr. Williams indicated that he would schedule Osborne to see Dr. Ahn.  Tr. 476.  On June 7, 2010, Osborne reported that he was doing better with his mood and his anxiety levels were down.  Tr. 474.  Osborne was continuing to exercise to relieve his stress but was still dealing with the loss of his wife.  Tr. 474.  Mr. Williams suggested that Osborne consider joining a bereavement group and provided him with contact numbers to call.  Tr. 474.  Beginning on June 25, 2010, Osborne started to see Dr. Ahn and also continued to see Mr. Williams through at least August 30, 2010.  Tr. 470-73.  On August 16, 2010, Mr. Williams noted that Osborne had had a good couple of weeks.  Tr. 471.  Osborne had traveled to West Virginia to spend a week at his

girlfriend's family's house.  Tr. 471.  During his August 30, 2010, visit with Mr. Williams,

Osborne indicated that his mother was still able to "push his buttons" and "exacerbate his

depression and anxiety."  Tr. 470.  Mr. Williams discussed stress management techniques with

Osborne and, because Osborne reported getting irritated when he went to his mother's to retrieve

his mail, he suggested that Osborne get a P.O. Box.  Tr. 470.  Osborne indicated that he was

leaving the house infrequently because he was too nervous to go out.  Tr. 470.

**Byong J. Ahn, M.D., Psychiatrist**

Following Mr. Williams' referral, on June 25, 2010, psychiatrist Byong J. Ahn saw

Osborne and conducted a psychiatric evaluation.  Tr. 466-68.   Dr. Ahn reported that Osborne:

> Looked tense and nervous with tendency to show some pressured speech.  He
> denied having suicidal thoughts or having thoughts of death wish at this time.
> Speech was generally coherent. No hallucinations or well-organized delusions,
> but a bit of low self-esteem with feeling nervous, tense, as well as anxiety-like
> symptoms.  He claims he feels panic, but it does not appear to be panic.  No
> impaired cognitive function at this time.  His affect was a little tense and nervous.

Tr. 467.  Dr. Ahn's June 25, 2010, evaluation contained three "Impressions:" (1) Generalized

Anxiety Disorder; (2) R/O Panic Disorder; and (3) Major Depression, R/O Bipolar Affective

Disorder.  Tr. 467.  Dr. Ahn recommended that Osborne take prescription medications.[5]  Tr. 468.

On July 19, 2010, Osborne followed up with Dr. Ahn.  Tr. 465.  During that visit,

Osborne reported that he had purchased the recommended prescription medications but he had

not taken them because he was concerned about the side effects.  Tr. 465.  Dr. Ahn prescribed a

new medication, Lexapro, he recommended that Osborne also take Xanax, and he advised

Osborne to follow up in one month.  Tr. 465.  On August 16, 2010, Osborne followed up with

Dr. Ahn and Osborne reported that he noticed some improvement in his anxiety and he was able

---

[5] Dr. Ahn prescribed Paxil and Xanax.  Tr. 468.

to sleep better.[6]  Tr. 464.  Dr. Ahn advised Osborne to take Xanax three times each day rather than twice each day and he advised Osborne to continue to take Lexapro.  Tr. 464.

Four days later, on August 20, 2010, Dr. Ahn completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment.  Tr. 459-60.  Dr. Ahn opined that Osborne had marked limitations in a number of different work-related abilities, including his ability to: (1) maintain attention and concentration for two-hour periods; (2) perform work activities at a reasonable pace; (3) keep a regular work schedule and maintain punctual attendance; (4) interact appropriately with others, e.g., public, supervisors, co-workers; and (5) make judgments commensurate with the functions of unskilled work, i.e., make simple work-related decisions.  Tr. 459-60.  Dr. Ahn stated that Osborne had the ability and capability to do unskilled/skilled jobs, but his psychological disorders prohibited adequate functioning at that time and Dr. Ahn noted that Osborne had had that problem for several years.  Tr. 460.  Dr. Ahn also stated that Osborne's memory was impaired due to his preoccupation; Osborne was constantly making lists and notes to remember what he was supposed to do.  Tr. 460.  Dr. Ahn assessed Osborne with a GAF score of 45[7] and noted that his highest GAF in the prior year was a 60.  Tr. 460.

## 2.    State agency consultative examining physicians

### Deborah A. Koricke, Ph.D, Clinical Psychologist

---

[6] Osborne noted some stomach problems but also indicated that he had been taking Pepcid and it was helping.  Tr. 464.

[7] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR at 34.

On May 8, 2007, clinical psychologist Deborah A. Koricke, Ph.D., interviewed Osborne and completed a Disability Assessment Report.[8]  Tr. 217-22.  Dr. Koricke diagnosed Osborne with major depressive disorder, recurrent, moderate.  Tr. 221.  She assessed Osborne with a GAF score of 45.  Tr. 221.

With respect to the four work-related abilities, Dr. Koricke opined that: (1) Osborne's ability to relate to others, including fellow works and supervisors, was moderately impaired due to his symptoms of depression; (2) Osborne's ability to understand, remember and follow instructions was moderately impaired due to his depression (he lacked the mental consistency required to adequately and regularly complete work-related tasks);[9] (3) Osborne's ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks was moderately impaired by his major depression; and (4) Osborne's ability to withstand stress and pressures associated with day-to-day work activity was moderately impaired due to his major depressive disorder.  Tr. 221-22.

**Thomas F. Zeck, Ph.D., Psychologist**

On May 29, 2008, psychologist Thomas F. Zeck, Ph.D., evaluated Osborne and completed a report.  Tr. 299-305.  Dr. Zeck diagnosed Osborne with depressive neurosis, not otherwise specified.  Tr. 304.  He assessed Osborne with a GAF of 52.  Tr. 304.  Dr. Zeck indicated that Osborne exhibited a flat affect and depressed mood.  Tr. 304.

With respect to the four work-related abilities, Dr. Zeck opined that: (1) Osborne's ability to relate to fellow workers and supervisors appeared to be moderately impaired by his depression and his concern about his physical health and well-being; (2) Osborne's ability to understand,

---

[8] Dr. Koricke's report was prepared in connection with Osborne's second application for disability benefits.  Tr. 218.

[9] Dr. Koricke noted that "[a]ny additional cognitive impairment secondary to his seizure activity would need to be ruled out."  Tr. 222.

remember and follow instructions appeared to be equivocal (he did well on some comprehension and memory tests but did not perform as well on some other memory tasks); (3) Osborne's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks may be mildly impaired because of his epilepsy; there was an inconsistency noted between his performance on the Wechsler Adult Intelligence Scale-III (WAIS-III) test as compared to his performance on the Wechsler Memory Scale-III test; (4)  Osborne's ability to withstand the stress and pressure of day-to-day work activity was moderately impaired because of his epilepsy as well as his depression.  Tr. 304-05.   Dr. Zeck also indicated that inconsistency between the test scores on the WAIS-III and Wechsler Memory Scale-III made it difficult to determine Osborne's ability to perform work.  Tr. 305.

### 3.      State agency reviewing psychologist

### <u>Aracelis Rivera, Psy.D.</u>

On June 17, 2008, psychologist Aracelis Rivera, Psy.D., completed a Mental RFC Assessment.  Tr. 306-08.  In the "Summary Conclusions" section of the Mental RFC Assessment, Dr. Rivera found no evidence of limitation in 6 of the 20 rated categories; he rated Osborne as not significantly limited in 8 of the 20 rated categories; and he rated Osborne as moderately limited in the remaining 6 categories.  Tr. 306-07.  The six moderately limited categories were (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to interact appropriately with the general public; (4) ability to ask simple questions or request assistance; (5) ability to accept instructions and respond appropriately to criticism from supervisors; and (6) ability to respond appropriately to changes in the work setting.  Tr. 306-07.

In the "Functional Capacity Assessment" section of the Mental RFC Assessment, Dr. Rivera concluded that the record suggested that Osborne did have some limitations.  Tr. 308.  However, he opined that "significant functional capacity" still remained.  Tr. 308.  Dr. Rivera indicated that working with the public may cause anxiety for Osborne but he could still interact on a superficial basis.  Tr. 308.   Dr. Rivera also opined that Osborne could comprehend, remember and carry out simple task instructions.  Tr. 308.

## C.    Testimonial Evidence

### 1.    Osborne's testimony

Osborne was represented by counsel and testified at the administrative hearing.  Tr. 37-50, 62-63.  In 2003, Osborne started to have seizures.  Tr. 38.  Thereafter, he started to see doctors, including a neurologist, for his seizures.  Tr. 38.  As part of his treatment for his seizures, since 2003, he has been taking prescription medication for his seizures.  Tr. 38-39.  As a result of his seizures, he has been hospitalized on more than one occasion but not recently.  Tr. 39.  Osborne indicated that there are some things that trigger his seizures, including looking into strobe lights, headaches, extreme heat, and fevers.  Tr. 39.  His last seizure occurred at the end of 2009.  Tr. 44.

Osborne has had lower back pain since sometime in the 1990's but he has not had it thoroughly checked out.  Tr. 48.  He also suffers from severe headaches and has experienced headaches since childhood.  Tr. 48-50.  Osborne has discussed his headaches with his neurologist but Osborne does not recall that his neurologist ever provided a clinical diagnosis for his headaches.  Tr. 49.

In 2006, Osborne was seeing a counselor for mental health issues.  Tr. 40.  His wife had passed away at that time.  Tr. 40.  Osborne's physicians have prescribed medication for his

mental health issues and he regularly sees a counselor, therapist, and/or psychiatrist.  Tr. 41.
Osborne stated that he had abused alcohol in the past but that in 2008 he stopped drinking on his
own.  Tr. 41, 46-47.  He is now able to sleep about two to five hours each night, which is an
improvement over how much sleep he was getting in the past.  Tr. 41.

 Osborne indicated that his lack of concentration and anxiety and feeling overwhelmed
contribute to his inability to work.  Tr. 42.  Also, he does not deal well with other people.  Tr. 42.
He rarely goes out and gets nervous and suffers from panic attacks when he is out in public.  Tr.
42. He tries to stay home alone as much as possible.  Tr. 42.  Osborne does go out in public as
necessary for things like shopping for food, but he tries not to be out for long.  Tr. 46.  Based on
his doctor's instructions, he works out at home and takes lots of walks.  Tr.  42-43.  He usually
walks alone but sometimes he walks with a friend.  Tr. 42.  He visits with family and sees friends
once in a while.  Tr.  43.  He listens to music and watches television.  Tr. 43.  However, he has a
difficult time concentrating and understanding television shows and movies.  Tr. 45.   Osborne's
concentration problems started after he had his first seizure.  Tr. 43-44.

 Osborne takes prescription medications for a number of different medical conditions,
including his epileptic seizures, anxiety and depression.  Tr. 48.  He also takes over-the-counter
Ibuprofen for his back pain and headaches.  Tr. 50.  At times, Osborne has been unable to afford
certain medications.  Tr. 62-63.

### 2.    Vocational expert's testimony

 Vocational Expert ("VE") Bruce Holderead testified at the hearing.  Tr. 50-62.   The VE
stated that Osborne's past work as a machinist was a skilled position, generally performed at the
medium exertional level.  Tr. 51.  The VE indicated that Osborne himself performed the position
at the medium exertional level.  Tr. 51.  Osborne also indicated that he was a supervisor.  Tr. 51.

10

Thus, the VE stated that Osborne had performed work as a machine shop supervisor, which was a skilled position, generally performed at the light exertional level.  Tr. 51.  The VE indicated that Osborne himself performed the position at the medium exertional level.  Tr. 51-52.

The ALJ asked the VE to assume a hypothetical individual of the same age, education, and work experience as Osborne who:  would be limited to lifting no more than 50 pounds occasionally; would be limited to lifting and carrying up to 25 pounds frequently; would never be able to climb ladders, ropes, or scaffolding; would be able to climb ramps or stairs no more than frequently; would be able to occasionally balance; would be able to frequently stoop, kneel, crouch and crawl; would be required to avoid concentrated exposure to excessive noise; should avoid concentrated exposure to excessive vibration; would be required to avoid all exposure to unprotected heights and moving machinery; operation of a motor vehicle would not be required as part of job; and work would have to be isolated from the public with only occasional interaction with co-workers.  Tr. 52.   The VE indicated that such an individual would be unable to perform Osborne's past work.  Tr. 52-53.  However, the VE indicated that there would be other work in the national or regional economy that such an individual would be able to perform, including (1) cleaner II, DOT 919.687-014 – an unskilled (SVP 2)[10], medium exertional level job with approximately 3,000 available in northeast Ohio and 260,000 available in the national economy; (2) linen room attendant, DOT 222.387-030 – an unskilled (SVP 2), medium exertional level job with approximately 3,000 available in northeast Ohio and 300,000 available in the national economy; and (3) attendant-campground (including parks and recreation areas),

---

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

DOT 329.683-010 – an unskilled (SVP 2), medium exertional level job with approximately 2,000 available in northeast Ohio and 200,000 available in the national economy.  Tr. 53-54.

In response to questioning by the ALJ and Osborne's counsel, the VE indicated that, if the above described individual would also need to be reminded of his tasks on an hourly basis or every two hours, a special accommodation would be required, precluding competitive work.  Tr. 54, 56.

The VE also testified that, if in addition to regularly scheduled breaks the individual would be off task for 20% or 15% of the day, there would be no jobs available to such an individual in the regional or national economy.  Tr. 55.

Osborne's counsel asked the VE questions regarding the level of concentration and attention and amount of training required for each of the listed jobs and the VE indicated that adequate concentration and attention would be required for all types of employment.  Tr. 56-62. The VE also indicated that no more than short demonstrations should be required in order for an individual to learn the positions of campground attendant, linen room attendant and cleaner II. Tr. 59-60.  The VE also stated that, if an individual were to lose consciousness while performing one of the three listed jobs, the potential hazards would be no more dangerous than if an individual lost consciousness while walking and falling on concrete.  Tr.  56-58.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment,[11] the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[12] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[12] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the
Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors
to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his October 13, 2010, decision, the ALJ made the following findings:

1.      Osborne met the insured status requirements through December 31, 2008.
Tr. 16.

2.      Osborne had not engaged in substantial gainful activity since April 30,
2003, the alleged onset date.  Tr. 16.

3.      Osborne had the following severe impairments: history of alcohol-related
seizures, with related clinical finding of brain atrophy, without identified
functional limitation, and with alcohol abuse in remission since July
2008, as well as depression. Tr. 16.  Osborne's gastrointestinal
esophageal reflux (GERD), alleged low back pain, liver and pancreas
damage were not severe impairments.  Tr.  17

4.      Osborne did not have an impairment or combination of impairments that
met or medically equaled a Listing.  Tr. 18-20.

5.      Osborne had the RFC to perform medium work except he is limited to
never climbing ladders or scaffolding; no more than frequently climbing
ramps and stairs; occasional balancing; no more than frequently stooping,
kneeling, crouching, or crawling; he needs to avoid concentrated
exposure to excessive noise and excessive vibration; he needs to avoid all
unprotected heights, and moving machinery; available positions must not
require operation of a motor vehicle; he is restricted to simple, routine
and repetitive tasks, with only occasional supervision, occasional
interaction with co-workers, and isolation from the public.  Tr. 20-22.

6.      Osborne was unable to perform his past relevant work.  Tr. 23.

7.      Osborne was born on April 24, 1969, and was 34 years old, defined as a
younger individual age 18-49, on the alleged disability date.  Tr. 23.

8.      Osborne had a high school education and was able to communicate in
English.  Tr. 23.

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

9.    Transferability of job skills was not material to the determination of disability.  Tr. 23.

10.   Considering Osborne's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Osborne could perform, including cleaner II, linen room attendant, and an attendant-campground.  Tr. 23-24.

Based on the foregoing, the ALJ determined that Osborne had not been under a disability from April 30, 2003, through the date of the decision.  Tr. 24.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

Osborne presents six arguments.  First, he argues that, when compared to the ALJ's own RFC, the hypothetical that the ALJ presented to the VE was inaccurate and incomplete. Doc. 14, pp. 5-6; Doc. 17, pp. 1-2.  Specifically, Osborne notes that the ALJ's RFC assessment included a limitation that restricted Osborne to simple, routine and repetitive tasks but the hypothetical the ALJ gave to the VE did not include that restriction.  Doc. 14, pp. 5-6; Doc. 17, pp. 1-2.  Thus, Osborne argues that the VE's testimony in response to the ALJ's hypothetical question fails to provide substantial evidence to support the Commissioner's Step Five determination.  Doc. 14, pp. 5-6; Doc. 17, pp. 1-2.

Second, Osborne argues that the ALJ did not account for Osborne's moderate concentration deficits, which the ALJ found to exist, in the RFC assessment.  Doc. 14, pp. 6-7; Doc. 17, pp. 2-3.   Osborne points out that the ALJ agreed with state consultative physician Dr. Koricke's opinion that Osborne was moderately impaired in his ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks and that, when evaluating the B-criteria under the Listings, the ALJ also concluded that Osborne had moderate difficulties in maintaining concentration, persistence, or pace.  Doc. 14, pp. 6-7; Doc. 17, pp. 2-3.  Osborne

15

also argues that the ALJ erroneously rejected treating psychiatrist Dr. Ahn's opinion that Osborne was actually markedly limited with respect to maintaining attention, concentration and performing work at a reasonable pace.  Doc. 14, pp. 7-8; Doc. 17, pp. 2-3.

Third, Osborne argues that the ALJ failed to follow the treating physician rule.  Doc. 14, pp. 8-9; Doc. 17, pp. 3-4.  Osborne asserts that, although the ALJ addressed treating psychiatrist Dr. Ahn's reports of marked limitations, the ALJ failed to state the weight given to Dr. Ahn's report, failed to apply the factors set forth in 20 C.F.R. § 404.1527, and failed to sufficiently explain how the ALJ's analysis affected the weight provided.  Doc. 14, pp. 8-9; Doc. 17, pp. 3-4.

Fourth, Osborne argues that substantial evidence does not support the ALJ's vocational evaluation of Osborne's environmental limitations.  Doc. 14, pp. 10-11; Doc. 17, pp. 4-5.  More particularly, Osborne argues that the DOT descriptions for the positions of attendant-campground and cleaner II include work requirements that would be precluded by the ALJ's established RFC.  Doc. 14, pp. 10-11; Doc. 17, pp. 4-5.  Thus, he argues that substantial evidence does not support the ALJ's finding that Osborne could perform the work of an attendant-campground or cleaner II.  Doc. 14, pp. 10-11; Doc. 17, pp. 4-5.

Fifth, Osborne argues that, because the ALJ declined to reopen a prior application that had been denied initially less than one year before the applications in this case were filed, the Commissioner unconstitutionally deprived him of due process and equal protection of the law.[13] Doc. 14, p. 12; Doc. 17, p. 5.  Plaintiff argues that the ALJ should have applied the "any reason"

---

[13] In Plaintiff's counsel's August 26, 2010, Memorandum for September 28, 2010, hearing, Plaintiff's counsel referenced the fact that two prior applications may be reopened.  Tr. 94.

standard, which applies to reopening within 12 months of initial denial, but instead applied the two or four year "new material evidence" rule.[14]  Doc. 14, p. 12.

Sixth, Osborne argues that, because the ALJ concluded that his history of alcohol abuse was not material to the determination, the ALJ's references to Osborne's history of alcohol abuse and severe impairment findings, which referenced a history of alcohol abuse, were improper. Doc. 14, p. 12; Doc. 17, pp. 5-6.  Osborne urges the Court to give special scrutiny to the decision because it appears that evidence was improperly considered.  Doc. 14, p. 12.

## B.    Defendant's Arguments

In response to Osborne's first argument, the Commissioner concedes that the ALJ's omission of an RFC restriction from the VE hypothetical was error.  Doc. 16, pp. 9-12. However, the Commissioner asserts that remand is not warranted because the ALJ's omission had no practical effect on the outcome of the case.  Doc. 16, p. 9.  The Commissioner asserts that all three of the jobs identified by the VE were unskilled positions with an SVP rating of 2.  Doc. 16, p. 9.  Further, the Commissioner asserts that performance of "simple, routine, and repetitive tasks" corresponds with the ability to perform unskilled work.  Doc. 16, pp. 9-10.  Thus, the Commissioner argues that, because Osborne has not shown that inclusion of "simple, routine, and repetitive tasks" in the VE hypothetical would have changed the ALJ's decision, the error was harmless.  Doc. 16, pp. 9-12.

In response to Osborne's second argument, the Commissioner argues that the ALJ's RFC, which restricted Plaintiff to simple, routine, repetitive tasks; only occasional supervision;

---

[14] Plaintiff and Defendant argue over whether the ALJ applied the proper standard of review for Plaintiff's request to reopen.  Doc. 16, p. 18.  Under the regulations, within 12 months of the date of the notice of the initial determination, a determination may be reopened for any reason.  20 C.F.R. §§ 404.988; 416.1488.  Otherwise, a determination may be reopened within two years (SSI claims) and within four years (DIB claims) upon a finding of "good cause."  *Id.* Under 20 C.F.R. §§ 404.989(a)(1) and 416.1489(a)(1) "good cause" will be found if "new and material evidence" is furnished.

occasional interaction with co-workers; and isolation from the public, adequately accounted for Plaintiff's credibly established mental limitations.  Doc. 16, pp. 12-14.

In response to Osborne's third argument, the Commissioner asserts that the ALJ evaluated treating psychiatrist Dr. Ahn's assessment in accordance with applicable regulations and substantial evidence supports the ALJ's analysis.  Doc. 16, pp. 14-16.  The Commissioner argues that Dr. Ahn's restrictive RFC is unsupported by his own treatment records and conflicted with other evidence of record, which at most showed moderate limitations in mental work-related abilities.  Doc. 16, pp. 15-16.  Accordingly, the Commissioner argues that the ALJ reasonably declined to adopt Dr. Ahn's opinion.  Doc. 16, p. 16.

In response to Osborne's fourth argument, the Commissioner argues that the ALJ satisfied his Step Five burden of demonstrating that there were a significant number of jobs in the national economy that Plaintiff could perform.  Doc. 16, pp. 16-17.  The Commissioner first asserts that, because Plaintiff did not question the VE at the hearing regarding the alleged conflict between his environmental limitations and the attendant-campground and cleaner II positions, the argument is waived.  Doc. 16, p. 16.  Alternatively, the Commissioner argues that, since the ALJ identified linen room attendant as a third job that Plaintiff could perform and the VE provided testimony showing that 3,000 such positions exist in northeast Ohio and 300,000 such positions exist in the national economy, the ALJ satisfied his Step Five burden.  Doc. 16, p. 16.  Additionally, the Commissioner argues that, because the VE indicated that there were other medium and light jobs that Plaintiff could perform,[15] any conflict between the VE's testimony and the DOT was harmless.  Doc. 16, p. 17.

---

[15] The VE did not provide specifics regarding the "other" medium and light jobs that were available.  Tr. 54.

In response to Osborne's fifth argument, the Commissioner argues that Plaintiff's constitutional rights were not violated when the ALJ declined to reopen his prior applications. Doc. 16, pp. 17-18.  Further, the Commissioner argues that the Plaintiff has failed to explain how, if the ALJ had reopened his prior applications, the ALJ's decision that Plaintiff was not disabled would have been different.  Doc. 16, pp. 18-19.

In response to Osborne's sixth and final argument, the Commissioner argues that, in accordance with applicable regulations, the ALJ properly considered all record evidence, including Plaintiff's alcohol use and history of alcohol abuse.  Doc. 16, pp. 19-20.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ's Step Five finding is not supported by substantial evidence.**

To satisfy his burden at Step Five, the Commissioner must make a finding "supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response

19

to a hypothetical question." *Id.* (citation omitted).  However, if an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations.  *Id.; Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do").

Here, the ALJ specifically included a limitation in the RFC that restricted Osborne to "simple, routine and repetitive tasks." Tr. 20.  However, to support his Step Five determination, the ALJ relied on VE testimony offered in response to a hypothetical question that did not include that restriction.[16]  Tr.  23-24, 52-55.  The Commissioner recognizes that the ALJ's omission of the restriction of "simple, routine and repetitive tasks" from the VE hypothetical question was error.  Doc. 16, p. 9.  However, the Commissioner argues that the error was harmless because the VE provided only unskilled jobs and "the performance of 'simple, routine, and repetitive tasks' is commensurate with the ability to perform unskilled work."  Doc. 16, p. 9. Although the VE identified unskilled jobs, and even though there may be jobs within the universe of unskilled work that are limited to simple, routine and repetitive work, it would be speculation to assume that the VE would have testified that the jobs of cleaner II, linen room attendant, and/or attendant-campground, would be available to someone who was limited to simple, routine *and* repetitive work.

---

[16] Although not argued by Plaintiff, it appears that the VE testimony in response to the ALJ's hypothetical question did not include another limitation that was part of the ALJ's RFC, i.e., only occasional supervision.  Tr. 20, 52-55. However, during the hearing, Plaintiff's counsel did elicit brief testimony from the VE concerning occasional supervision.  Tr. 60-61.

Considering the complete absence from the VE hypothetical of a restriction to "simple, routine and repetitive" tasks and because the burden shifts to the Commissioner at Step Five, the ALJ's error was not harmless and the ALJ's Step Five determination cannot be said to be supported by substantial evidence.  Thus, reversal and remand is warranted for further vocational expert testimony based on a hypothetical question or questions that completely and accurately describe Plaintiff's RFC limitations.

**B.     The ALJ properly considered Dr. Ahn's opinion in accordance with the treating physician rule.  However, on remand, the ALJ should further explain how he accounted for moderate limitations in concentration, persistence and pace.**

In his second argument, Plaintiff argues that the RFC is not supported by substantial evidence.  Doc. 14, pp. 6-8; Doc. 17, pp. 2-4.  He asserts that the ALJ's RFC limitation, which restricts Osborne to simple, routine, and repetitive tasks, does not sufficiently account for Osborne's moderate limitations in concentration, persistence and pace.  Doc. 14, pp. 6-7; Doc. 17, pp. 2-3.  He also asserts that the ALJ erred by rejecting Dr. Ahn's opinion that Osborne was in fact markedly limited with respect to maintaining concentration, persistence and pace and/or that the ALJ failed to follow the treating physician rule with respect to Dr. Ahn.  Doc. 14, pp. 7-8; Doc. 17, pp. 3-4.

**1.   The ALJ did not violate the treating physician rule.**

Plaintiff's claim that the ALJ erred and/or that the RFC is not supported by substantial evidence because he rejected Dr. Ahn's opinion that Osborne was markedly limited in his ability to maintain concentration, persistence and pace and/or because the ALJ failed to follow the treating physician rule with respect to Dr. Ahn is without merit.

Under the treating physician rule, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and

laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c).  However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011) (indicating that an exhaustive factor-by-factor analysis is not required).  Clear articulation of how the treating physician rule is applied allows a claimant to understand the rationale for the Commissioner's decision and it allows for meaningful review of the ALJ's application of the treating physician rule.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242-243 (6th Cir. 2007).

Here, the ALJ clearly considered Dr. Ahn's opinion.[17] The ALJ's reasons for not providing controlling weight to that opinion are "good reasons" and his reasoning is clear and allows for meaningful review.  Tr. 19, 22.  For example, the ALJ considered the supportability of Dr. Ahn's opinion of marked impairments. *See* 20 C.F.R. § 404.1527(c)(3) (indicating that

---

[17] The ALJ also considered and discussed the opinion and records of Mr. Williams, a licensed professional clinical counselor who provided counseling to Osborne.  Tr 19, 22.

supportability of a medical opinion is a factor to consider).  After discussing the fact that Dr.

Ahn opined that Osborne had marked impairments in a number of different areas, the ALJ

concluded that "Dr. Ahn's medical records and observations provided" were not consistent with

his evaluation and there was insufficient evidence to support his conclusions.  Tr. 22.  The ALJ

also indicated that "[a]side from a low GAF score, nothing in Dr. Ahn's records demonstrate a

rationale for the marked impairments." Tr. 19.   Additionally, the ALJ considered how

consistent Dr. Ahn's opinion was with the record as a whole.  *See* 20 C.F.R. § 404.1527(c)(4)

(indicating that consistency of a medical opinion with the record as a whole is a factor to

consider).  In conducting his analysis of the record evidence, the ALJ concluded that the medical

opinions reflecting moderate impairments were more consistent with Osborne's symptoms as

described by him to his treating physicians and counselors.  Tr. 19.

The ALJ's assessments of the supportability and consistency of Dr. Ahn's opinion are

supported by the record.  For example, during a June 7, 2010, visit with Mr. Williams, Osborne

reported that he was doing better with his mood and his anxiety levels were down.  Tr. 474.

Further, although Osborne was still dealing with the loss of his wife, Osborne, as recommended,

was continuing to exercise to relieve his stress.  Tr. 474.   During an August 16, 2010, visit, Mr.

Williams noted that Osborne had had a good couple of weeks.  Tr. 471.  Osborne had traveled to

West Virginia to spend a week at his girlfriend's family's house.  Tr. 471.  With respect to Dr.

Ahn's records, on June 25, 2010,  Dr. Ahn reported that Osborne:

> Looked tense and nervous with tendency to show some pressured speech.  He
> denied having suicidal thoughts or having thoughts of death wish at this time.
> Speech was generally coherent. No hallucinations or well-organized delusions,
> but a bit of low self-esteem with feeling nervous, tense, as well as anxiety-like
> symptoms.  He claims he feels panic, but it does not appear to be panic.  No
> impaired cognitive function at this time.  His affect was a little tense and nervous.

Tr. 467.   On August 16, 2010, Osborne followed up with Dr. Ahn and Osborne reported that he noticed some improvement in his anxiety and was able to sleep better.  Tr. 464.  Osborne noted some stomach problems but also indicated that he had been taking Pepcid and it was helping.  Tr. 464.

Since the ALJ clearly considered and explained his reasons for not accepting Dr. Ahn's opinion of marked limitations, and that reasoning is supported by the record and allows for meaningful review by this Court, Plaintiff's claim that the ALJ failed to follow the treating physician rule is without merit.

### 2. Further explanation as to how the ALJ accounted in the RFC for his finding that Osborne had moderate limitations in concentration, persistence and pace is required.

With respect to whether the ALJ adequately accounted in the RFC for his findings that Osborne had moderate limitations in concentration, persistence and pace, the Court notes that, here, the ALJ did discuss at length the various medical opinions relating to Osborne's ability to maintain concentration, persistence and pace.  Tr. 19, 22.  Also, the ALJ explained that the RFC accounted for Osborne's difficulties with respect to focusing and concentrating by requiring occasional supervision.[18]  Tr.  22.  Missing from the ALJ's reasoning, however, is an explanation as to how the ALJ accounted in the RFC for moderate limitations in pace and persistence, not just concentration.

In *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010) the ALJ found that the claimant had moderate difficulties in concentration, persistence and pace but the ALJ did not ask the vocational expert a hypothetical containing a fair summary of those restrictions.  *Id.* at 516.  Instead, the ALJ's hypothetical only limited the claimant to simple, repetitive tasks and

---

[18] As noted *supra*, the restriction of occasional supervision was not included in the ALJ's hypothetical question to the VE.  Tr. 52.  However, Plaintiff's counsel did elicit brief testimony from the VE concerning occasional supervision.  Tr. 60-61.

instructions.  *Id.*  The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination.  *Id.*

Although *Ealy* may not establish a bright-line rule as to how an ALJ must accommodate moderate limitations in concentration, persistence or pace, it is instructive.  Without more explanation in the ALJ's decision, it is unclear how a limitation of occasional supervision fairly described Osborne's limitations in concentration, persistence *and* pace.  Thus, on remand, the ALJ should provide further explanation as to how he accounted in the RFC for his findings of moderate limitations in concentration, persistence *and* pace, or alternatively, explain why additional restrictions beyond simple, routine, and repetitive tasks and occasional supervision were not necessary.  *See Ealy*, 594 F.3d at 516-517 (citing *Edwards v. Barnhart,* 383 F.Supp.2d 920, 930–31 (E.D.Mich.2005) for the propositions that "hypothetical limiting claimant to 'jobs entailing no more than simple, routine, unskilled work' not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace" and "'Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job.'").

**C.**      **The ALJ's discussion of evidence relating to alcohol was not error.**

Plaintiff alleges that the Commissioner's decision should be reversed because the ALJ discussed facts and evidence relating to Plaintiff's history of alcohol abuse.  Doc. 14, p. 12; Doc. 17, pp. 5-7.  This argument is without merit.  Plaintiff does not and cannot assert that the record does not contain evidence of a history of alcohol abuse.  For example, during the hearing, Plaintiff testified that he believed he had abused alcohol in the past but had since stopped.  Tr. 41, 46-47; *see also* Tr. 382 (reflecting treatment in 2003 for alcohol withdrawal seizures).

Accordingly, the ALJ's consideration and discussion of Plaintiff's alcohol use is not a basis for reversal or remand.

**D.**        **Other issues.**

In his fourth argument, Osborne argues that the VE's testimony conflicts with the DOT and therefore reversal and remand is required for further testimony as to whether Osborne could or could not work as a cleaner II or attendant-campground.  Doc. 14, pp. 10-11; Doc. 17, pp. 4-5. As discussed herein, the Court is ordering remand, in part, to allow for further vocational expert based on an accurate and complete hypothetical.  Since further proceedings on remand may impact the ALJ's findings, it is not necessary for the Court to address Plaintiff's fourth argument which relates to the vocational expert testimony. *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

Osborne's fifth argument relates to whether or not the correct standard for reopening a prior application was applied.  Doc. 14, p. 12; Doc. 17, 5.  Osborne in his Reply acknowledges that the issue of reopening does not need to be decided because the agency has not made a finding that Osborne is disabled.  Doc. 17, p. 5.  Thus, since there has not been a finding of disability at this time, it is not necessary for the Court to address Plaintiff's fifth argument.

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with the Memorandum and Opinion.

Dated:  September 17, 2013

_____
Kathleen B. Burke
United States Magistrate Judge